**Paul Eugene MILLER, a.k.a. Pisko Kalupah, Plaintiff–Appellant,**

v.

**Daniel MCBRIDE, et al., Defendants–Appellees.**

No. 02–1147.

United States Court of Appeals, Seventh Circuit.

Submitted April 17, 2003.*

Decided April 17, 2003.

Rehearing Denied July 17, 2003.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Before COFFEY, RIPPLE, and
DIANE P. WOOD, Circuit Judges.

## ORDER

A dispute over a missing book escalated into a bloody fight between two inmates at an Indiana prison. One of the inmates, Paul Eugene Miller, was injured during the fight and subsequently sued prison officials under 42 U.S.C. § 1983 for failing to protect him from other prisoners, particularly those in the notorious Gangster Disciples gang. The district court granted summary judgment for the prison officials, and Mr. Miller appeals. We affirm because Mr. Miller failed to show that the officials were deliberately indifferent to his safety.

The facts relating to Mr. Miller's claims are drawn from the materials that the parties presented at the summary judgment stage. On May 13, 1997, while serving time at the Westville Correctional Center (WCC) in northern Indiana, Mr. Miller informed prison staff that he had been threatened by several Gangster Disciples (whom he identified by name) and requested housing in the protective custody dormitory. The record does not reflect why the gang members threatened Mr. Miller. His case manager at WCC, Ms. Susan Tappan, transferred him to protective custody that same day. In the same request, Mr. Miller also asked to be housed in a single cell (protective custody was comprised of an open dorm area with no cells), but Ms. Tappan informed him that WCC did not have any.

On September 21 or 22, prisoner J. Grandberry, an alleged member of the Gangster Disciples but not one of those that Mr. Miller had named in his earlier request, was transferred into the same protective custody dorm. Other prisoners quickly alerted Mr. Miller that Grandberry had been inquiring as to his whereabouts. Once again, the record does not reflect why Grandberry was looking for Mr. Miller, but Mr. Miller speculates that Grandberry intended to carry out a "hit" on him, ordered by either the Gangster Disciples or prison staff.

Upon returning to the dorm on September 23, Mr. Miller discovered that one of his books was missing. Another prisoner told Mr. Miller that he had earlier seen Grandberry carrying something away from Mr. Miller's bed. Mr. Miller then confronted Grandberry and asked him whether he had taken the book. Mr. Miller, testifying at his deposition, stated that he did not first tell a staff member about the missing book because he did not expect a fight. But an argument between the two ensued, and Grandberry punched Mr. Miller in the face several times. Another prisoner intervened and started fighting with Grandberry, drawing several other prisoners into the fray. Mr. Miller stated that "as far as I'm concerned, it's done and over with" and started walking away from the fight. *See* Appellants' App. at 18. But

Grandberry came up behind him and hit him over the head with a padlock. During the fight, there was no prison guard monitoring the floor because Officer Thomas Ludwig, the guard assigned to the protective custody dorm that day, had left the dorm shortly before the fight without securing a relief officer. After Mr. Miller was later treated for his injury, he learned that the blow had ruptured his eardrum.

For reasons that the record does not make clear, Ms. Tappan transferred Mr. Miller three weeks later from protective custody to another dorm. Within 30 minutes of Mr. Miller's arrival in this new dorm, unidentified gang members surrounded him. Prison staff immediately transferred him back to protective custody. But Ms. Tappan, concluding that there was not enough substantiating documentation to keep him in protective custody, transferred him sometime after that back into the general population, and eventually to another prison. Mr. Miller filed with Daniel McBride, superintendent of WCC, two grievances about the transfers out of protective custody and his injuries from the fight, but Superintendent McBride denied both grievances.

Mr. Miller thereafter filed in district court this § 1983 suit alleging that McBride, Tappan, and Ludwig failed to heed his requests for protective custody and failed to protect him from other prisoners, ultimately resulting in his being injured during the fight with Grandberry. Mr. Miller further alleged that the defendants, in retaliation for his filing several lawsuits, intentionally placed Grandberry in the same dorm, knowing that Grandberry would likely attack him. The district court granted summary judgment for the defendants, concluding that Mr. Miller failed to establish that the defendants exhibited deliberate indifference to his safety. We review the district court's decision to grant summary judgment *de novo*. *Boyce v. Moore*, 314 F.3d 884, 888 (7th Cir.2002).

■ The central question in this case is whether the fight and Mr. Miller's various housing placements are enough to raise a triable issue on whether any of the defendants exhibited deliberate indifference to Mr. Miller's safety, amounting to cruel and unusual punishment under the Eighth Amendment. Prison officials have a duty to protect prisoners from other prisoners, but this does not mean that the Eighth Amendment is implicated every time a prisoner harms another. *Farmer v. Brennan*, 511 U.S. 825, 833–34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Rather, to survive summary judgment, Mr. Miller must show that he was incarcerated under conditions posing a "substantial risk of serious harm" and that the defendants acted with deliberate indifference to that danger. *Id.* at 834, 114 S.Ct. 1970. It is the latter question of deliberate indifference that is at issue here, because we can assume that Mr. Miller's injury, or the risk of being attacked by a Gangster Disciple in a similar fashion, was sufficiently serious.

A prison official may be found deliberately indifferent only if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970. Ordinary, or even gross, negligence is not enough to establish liability. *Washington v. LaPorte County Sheriff's Dep't*, 306 F.3d 515, 518 (7th Cir.2002). And officials who actually know of a substantial risk to inmate safety are free from liability if they respond reasonably to the risk, even if the harm ultimately is not averted. *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir.2002). Furthermore, a supervisor cannot be held

liable unless he was personally involved in the wrongful conduct, either by participating in or causing the alleged constitutional violation. *Boyce*, 314 F.3d at 888.

We begin our analysis with Mr. Miller's various placements in prison housing. When he requested protective custody because of threats from named Gangster Disciples, Ms. Tappan responded reasonably by immediately transferring him to protective custody. Although Mr. Miller may have wished to be transferred to a facility with single cells or to have remained in protective custody later after his fight with Grandberry, courts afford prison administrators–in this case Ms. Tappan and Superintendent McBride–great discretion in deciding where to place prisoners. *See King v. Fairman*, 997 F.2d 259, 262 (7th Cir.1993).

■ As for the fight with Grandberry, there is no evidence that any of the defendants knew that Grandberry posed a threat to Mr. Miller. Mr. Miller did not alert any staff members to the potential danger upon learning that Grandberry had asked about him nor did he inform staff that he intended to confront Grandberry about the missing book. *See Washington*, 306 F.3d at 518 (officials cannot have actual knowledge of risk unless prisoner reports trouble); *cf. Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir.2002) (summary judgment precluded where plaintiff notified prison staff about threats from another prisoner). Although Mr. Miller had reported threats from other Gangster Disciples (and assuming that prison staff even knew that Grandberry was affiliated with the Gangster Disciples), the defendants could not be expected to know that Grandberry *in particular* posed a threat to Mr. Miller, as he had never identified Grandberry as an antagonist in the past. *See Peate*, 294 F.3d at 883 (staff cannot be expected to predict fights without any

knowledge of "bad blood" between prisoners); *Lewis v. Richards*, 107 F.3d 549, 554 (7th Cir.1997) (officials had no way of knowing that plaintiff was in heightened peril when he did not report new threats from *different* gang members). In fact, Mr. Miller admitted during his deposition that even he did not expect a fight with Grandberry. Although it was almost certainly negligent for Officer Ludwig to leave the dorm without securing a replacement monitor, even gross negligence is not enough to establish constitutional liability. *Washington*, 306 F.3d at 518. And Superintendent McBride cannot be liable for Mr. Miller's injuries from the fight because he lacked personal involvement in the incident; he was not involved in either the decision to transfer Mr. Miller to that dorm in May or the day-to-day operations of the unit. *See Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir.1998). Finally, there is absolutely no evidence that any of the defendants, or any other prison officials for that matter, arranged for Grandberry to attack Mr. Miller in retaliation for filing lawsuits. *Cf. Case*, 301 F.3d at 606–07 (discussing evidence of guard offering to cover for prisoner who planned to attack another prisoner). We conclude, as did the district court, that Mr. Miller has not shown that the defendants were deliberately indifferent to his safety.

■ In addition to challenging the grant of summary judgment, Mr. Miller also attacks the way that the district court handled certain discovery matters, but we find no abuse of discretion, *see Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir.2002). In July 2001 the district court acted within its discretion by denying Mr. Miller's request for a further extension of time to conduct discovery, given that, as Judge Sharp noted, the deadline had already been extended six times (for a total of 15 months) for Mr. Miller. In another July

2001 order, this time denying a motion to compel, the district court noted incorrectly that Mr. Miller had failed to serve the defendants properly. But Mr. Miller was not prejudiced by this denial because the defendants eventually complied with his request for documents, on which the motion to compel was based. *See Peate,* 294 F.3d at 884 (no reversible error where plaintiff was not prejudiced). And Judge Sharp did not abuse his discretion by denying as moot another motion to compel in November 2001, as the defendants had already complied with Mr. Miller's requests for documents and answers to interrogatories. Furthermore, Mr. Miller was not prejudiced by the defendants' delay in responding to his discovery requests because he was able to include the defendants' answers in his response to and cross-motion for summary judgment.

AFFIRMED.