991 F.2d 799
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Fabio A. DIAZ, Plaintiff/Appellant,
v.
G. Michael BROGLIN, et al., Defendants/Appellees.
 No. 92-1507.
 United States Court of Appeals, Seventh Circuit.
 Submitted April 12, 1993.*
Decided April 15, 1993.
 
 Before POSNER and KANNE, Circuit Judges, and PELL, Senior Circuit Judge.
 
 ORDER
 
 1
 Fabio Diaz brought an action under 42 U.S.C. § 1983, claiming that prison officials at Westville Correctional Center had violated his Eighth Amendment rights by depriving him of medical care. After dismissing claims for damages against the defendants in their official capacities, the district court granted the defendants' motion for summary judgment. Diaz then filed a "motion to amend judgment or in the alternative for relief from judgment" under Federal Rule of Civil Procedure 59(e) and a "motion to file newly discovered evidence." Diaz appeals, arguing that summary judgment for the defendants was improper. He also appeals the dismissal of claims for damages against the defendants in their official capacities, the denial of appointment of counsel, and the denial of his post-judgment motions.
 
 
 2
 Dismissal of Diaz' claims for damages against the defendants in their official capacities was proper. Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989) ("neither a State nor its officials acting in their official capacities are 'persons' under § 1983"); see also Kentucky v. Graham, 473 U.S. 159 (1985).
 
 
 3
 Diaz argues that the district court's refusal to appoint counsel was an abuse of discretion. The district court properly applied the factors in Maclin v. Freake, 650 F.2d 885, 887-889 (7th Cir.1981), and found that Diaz did not need appointed counsel in order to adequately pursue his claims. Jackson v. County of McLean, 953 F.2d 1070 (7th Cir.1992). We agree and therefore conclude that the district court did not abuse its discretion.
 
 
 4
 Diaz also argues that two defendants, nurses Dawn Kortman and Caroline Schumaker, were not entitled to relief from default. There was a default entry against Kortman and Schumaker, but no default judgment. The district court has discretion to set aside an entry of default for good cause, Fed.R.Civ.P. 55(c). In this case, the court did not explicitly set aside the entry of default, but it did grant summary judgment to all the defendants, including Kortman and Schumaker. We find that the district court did not abuse its discretion by refusing to enter a default judgment. See 10 Charles A. Wright et al., Federal Practice and Procedure: Civil 2d § 2693 (1983); see also Zuelzke Tool & Eng. v. Anderson Die Castings, 925 F.2d 226 (7th Cir.1991).
 
 
 5
 Diaz' real complaint is with the granting of summary judgment to the defendants. Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).
 
 
 6
 In order to sustain an Eighth Amendment claim against the defendants for denial of medical care, Diaz had to show that the defendants exhibited "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97 (1976). For the reasons stated in the attached report and recommendation of the magistrate judge and adopted by the district court, we find that Diaz has not made the requisite showing.
 
 
 7
 AFFIRMED.
 
 UNITED STATES DISTRICT COURT
 FOR THE
 NORTHERN DISTRICT OF INDIANA
 SOUTH BEND DIVISION
 Cause No. S87-749 (AS)
 
 8
 Fabio Diaz, Plaintiff,
 
 
 9
 v.
 
 
 10
 G. Michael Broglin, et al., Defendants.
 
 Entry for October 31, 1991
 REPORT AND RECOMMENDATION
 
 11
 This cause is presently before the court on defendants' motions for summary judgment filed on January 24, 1988 and June 27, 1990, as well as the plaintiff's motion for summary judgment filed on July 11, 1989.
 
 Summary Judgment Standard
 
 12
 Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for the motion, and identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, once a properly supported motion for summary judgment is made, the party that bears the burden of proof on a particular issue at trial cannot resist the motion by merely resting on its pleadings. U.S. v. Lair, 854 F.2d 233, 235 (7th Cir.1988). Rather, the party opposing the motion must "affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." Beard v. Whitley County REMC, 840 F.2d 405, 410 (7th Cir.1988); Valley Liquors, Inc. v. Renfield Importers, Ltd., 822 F.2d 656, 659 (7th Cir.1987). "A genuine issue for trial only exists when there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party." Celotex Corp. v. Catrett, 106 S.Ct. at 2553. "Summary judgment is properly entered in favor of a party when the opposing party is unable to make a showing sufficient to prove an essential element of a case on which the opposing party bears the burden of proof." Common v. Williams, 859 F.2d 467 (7th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); Flip Side Productions, Inc. v. Jam Productions, Ltd., 843 F.2d 1024, 1032 (7th Cir.1988). The inquiry involved in ruling on a motion for summary judgment implicates the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at trial. Anderson, 106 S.Ct. at 2512. All factual inferences must be drawn in favor of the non-moving party. Valley Liquors, 822 F.2d at 659.
 
 
 13
 The defendants' submission in support of their June 27, 1990 summary judgment motion satisfies their burden under Rule 56. The plaintiff has not met his burden of presenting specific facts to show that there is a genuine issue of material fact. Further, the plaintiff has not shown that there is sufficient evidence in his favor so that a jury could return a verdict in his favor. Finally, the plaintiff's submissions in support of his own motion for summary judgment have not satisfied his burden under Rule 56. Accordingly, the record before the court shows no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law. For the foregoing reasons, the court now recommends that the defendants' motion for summary judgment be granted, and the plaintiff's motion for summary judgment denied.
 
 Procedural Background
 
 14
 Plaintiff Fabio Diaz, an inmate at Westville Correctional Center ("WCC") in Westville, Indiana, filed a pro se complaint in this cause on December 22, 1987, pursuant to 42 U.S.C. § 1983. His original complaint alleges that defendants G. Michael Broglin, Kurt Plescher, and Anthony Metzcus provided inadequate treatment of a serious skin disorder. Mr. Diaz claims that he was denied access to a dermatologist and denied medication from September through October, 1987, and that these denials constituted cruel and unusual punishment under the Eighth Amendment.
 
 
 15
 On December 24, 1987, Mr. Diaz filed a motion for temporary restraining order and preliminary injunction which the court subsequently denied. The defendants responded to Mr. Diaz's complaint by denying all of the allegations contained therein and filing a motion to dismiss on January 22, 1988. On February 24, 1988, the court converted this motion to a motion for summary judgment. The defendants subsequently submitted documentation specifically addressing the allegations contained in Mr. Diaz's complaint. He filed his response to defendants' motion for summary judgment on March 8, 1988. This matter is still pending before the court. In an order dated June 6, 1988, the court dismissed all claims against defendants Broglin, Plescher, and Metzcus in their official capacities.
 
 
 16
 Mr. Diaz filed his own motion for summary judgment on July 13, 1989. On July 28, 1989, he filed a motion for leave to file a supplemental complaint, and on August 7, 1989 the court granted this motion. This supplemental complaint, which was filed on August 7, 1989, named two additional defendants who were initially identified as "Joan Doer." Mr. Diaz alleged that these defendants were nurses who had refused to see him about a stomach problem. He claimed that the nurses' conduct constituted deliberate indifference to his serious medical needs, and was thus in violation of the Eighth Amendment. On December 29, 1989, he filed a request for service of summons substituting Dawn Kortman and Caroline Schumaker for the "Joan Doer" identified in the August 7 complaint.
 
 
 17
 Mr. Diaz subsequently failed to perfect service on defendants Kortman and Schumaker. When he served Kortman and Schumaker on January 9, 1990, Mr. Diaz made no attempt to serve the supplemental complaint on defendants' counsel. On February 16, 1990, Mr. Diaz obtained an entry of default against defendants Kortman and Schumaker. Mr. Diaz, however, failed to serve defendants' counsel with a copy of his request for entry of default.
 
 
 18
 Defendants' counsel immediately filed a response seeking an order vacating and setting aside the court's entry of default. On April 23, 1990, the court reserved its ruling on the default issue, and referred all pending and future dispositive motions to this court for report and recommendation.
 
 
 19
 On June 27, 1990, defendants filed a new motion for summary judgment, accompanied by a supporting memorandum, various affidavits, and a host of medical records. On July 10, 1990, plaintiff filed his response to defendants motion for summary judgment. On September 17, 1990, Mr. Diaz filed a motion for leave to file another supplemental complaint. The court granted his motion on October 30, 1990, and deemed his supplemental complaint filed as of that date.
 
 
 20
 In his second supplemental complaint, Mr. Diaz alleges additional violations of his Eighth Amendment rights. He claims that on September 9, 1990, Dr. Velazco observed an elevated cholesterol level in him and ordered a low cholesterol diet. Mr. Diaz alleges that, at the direction of defendants Anthony Metzcus and G. Michael Broglin, unspecified prison employees have denied him the special diet prescribed by Dr. Velazco, thereby placing him in grave danger of suffering a heart attack.
 
 
 21
 Factual Background of Plaintiff's Original Complaint
 
 
 22
 Mr. Diaz's original complaint centers on the defendants' alleged denial of medication to him to treat a skin problem. He claims that on August 20, 1987 a Dr. "Pattel" referred him to a dermatologist. Then, on September 3, 1987, a Dr. "Benan" also referred him to a dermatologist for treatment of a "serious skin illness." Mr. Diaz asserts that on September 18, 1987, nurse Geraldine Wilson prescribed Caladryl lotion for him, and verified his appointment with the dermatologist. Mr. Diaz does not provide the specific date on which he was allegedly scheduled to see the dermatologist. However, he complains that the defendants, specifically Kurt Plescher, refused to take him to his appointment with the dermatologist. Mr. Diaz does not supply the date of this alleged occurrence. Further, he alleges that Mr. Plescher denied him medication prescribed for his skin disorder by both Dr. "Benan" and Geraldine Wilson.
 
 
 23
 In support of his subsequent December 24, 1987 motion for a temporary restraining order (which this court denied), Mr. Diaz filed his own affidavit, accompanied by affidavits from four other inmates at WCC. In his affidavit, Mr. Diaz states that following his August 20, 1987 visit with Dr. "Pattel," the doctor prescribed Aristocort for his skin problem. After his September 3, 1987 visit with Dr. "Benan," Mr. Diaz says that this doctor also prescribed Aristocort and an antifungal medication. He claims that on September 17, 1987, defendant Kurt Plescher denied him the prescribed medication. Mr. Diaz states that on September 18, 1987, Nurse Geraldine Wilson prescribed Caladryl lotion for his problem, and that Mr. Plescher also denied him this medication. On September 21, 1987, Mr. Diaz says that Dr. "Benan" prescribed him Maxiflor, but again Mr. Plescher denied him this medication. On September 21, 1987, Mr. Diaz says that Dr. "Benan" prescribed him Maxiflor, but again Mr. Plescher denied him this medication. On October 8, Mr. Diaz states that he asked to be taken to his appointment with the dermatologist and was denied this opportunity.
 
 
 24
 Each of the affidavits submitted by Mr. Diaz's fellow inmates attests that he was suffering from a skin disorder involving a rash and peeling skin. One inmate, Jerry Hillegas, states that "In or about Sept. 18, 1987 I was in line for take medication right-behind Mr. Fabio Diaz. When Diaz turn came up and he give he medication card to Mr. Pleascher, Mr. Pleascher denied Diaz's medication." (Affidavit of Jerry Hillegas, November 9, 1987).
 
 
 25
 In their January 22, 1988 memorandum in support of their motion to dismiss (which the court subsequently converted to a motion for summary judgment on February 24, 1988), the defendants contend that plaintiff's medical records "clearly support a finding that Plaintiff has received medical care for his skin problem as well as other health concerns on a regular basis. The records indicate he received numerous medications and was scheduled to receive treatment at a dermatology clinic."
 
 
 26
 In conjunction with both their February 24, 1988 motion for summary judgment and their June 27, 1990 motion for summary judgment, the defendants submitted copies of Mr. Diaz's extensive medical records from the period in question. These records include treatment notes from Mr. Diaz's sick-call appointments, physician's order forms, medication records, specialist consultation notes, x-ray reports, and reports from tests conducted by medical personnel not employed by WCC.
 
 
 27
 According to these records, Mr. Diaz's skin problems were first noted on December 18, 1986, just after he entered WCC. He complained of the skin rash at issue in this case during a sick-call on August 14, 1987. He claimed that the rash, which covered a large part of his body, was due to the wool blanket provided for him at the prison. A cotton blanket was prescribed for his use, as well as Benedryl to be taken internally. On August 31, 1987, the treatment record indicates that Mr. Diaz was still suffering from an itchy rash all over his body, and that the medication he was receiving was apparently not healing the rash. It was also noted that he had been referred to see a dermatologist, but that it was unknown when the dermatologist would visit WCC.
 
 
 28
 On August 20, 1987, Aristocort cream was prescribed for Mr. Diaz's rash. Then, on September 3, Benedryl was again prescribed, along with Aristocort and an antifungal cream. On September 8, 1987, the treatment record shows that Mr. Diaz had a "dry, scaly rash over most of body," and that a referral for a dermatologist had been sent in on September 3. Mr. Diaz indicated that the cotton blanket helped the itching from the rash. On September 18, Caladryl lotion was initially prescribed for the rash, but later withdrawn. Kurt Plescher, the medical staff person distributing medication, was advised to hold the Caladryl because a doctor had already ordered Aristocort and antifungal cream for treatment.
 
 
 29
 On September 21, 1987, Maxiflor cream was ordered to treat Mr. Diaz's problem. Medication records indicate that Mr. Diaz received the Maxiflor cream as prescribed until it was discontinued following an October 5 visit to sick-call. A week later, on September 28, Mr. Diaz told the nurse on duty that the Maxiflor cream was not helping the rash, and was advised to continue with his present medications until he was seen in the dermatology clinic. On October 5, Mr. Diaz reported to sick-call and stated that nothing was healing the rash, and that it was spreading onto his face. On October 22, he was informed that he had been scheduled to see the dermatologist "next month."
 
 
 30
 On November 4, 1987, Mr. Diaz saw Dr. E.C. Liss, a dermatologist. Dr. Liss noted that "[p]atient has a rash over his whole body," and that "[h]e is being treated with Fulvicin and Monistat Lotion, Chamberge lotion, Menthol in Triamcinolone and Menthol Triamcinolone in Lubraderm and Aristocort Cream." Dr. Liss further noted that "Patient presents postules [sic] many places over his body." A biopsy was performed on Mr. Diaz's skin. Dr. Liss prescribed a 500 mg. dosage of Cloxicillin to be taken for 30 days, as well as a return visit.
 
 
 31
 On December 2, 1987, Mr. Diaz returned to see Dr. Liss. Dr. Liss noted that "[p]atient still presents pustules on his abdomen." A prescription for 100 mg. Minocin tablets was entered, along with a prescription for Cleocin lotion. Dr. Liss told Mr. Diaz to return in one month. Mr. Diaz visited Dr. Liss again on January 6, 1988. He still complained of his skin itching and hurting. Dr. Liss took a smear culture of his lesions, and renewed his prescription for 500 mg. of Cloxacillin. On March 2, 1988, Dr. Liss saw Mr. Diaz again, and reported that "[p]atient is doing well." Dr. Liss continued the prescription for Cloxacillin for an additional 30 days, and discharged Mr. Diaz.
 
 
 32
 On July 10, 1990, following the defendants' June 27 motion for summary judgment, Mr. Diaz filed an affidavit in response to defendants' memorandum. In his affidavit, Mr. Diaz states that as a result of the defendants' alleged deliberate indifference to his skin condition, he "suffered serious damaging scars over my body, and suffered great pains due to treatment when Dr. Liss had to 'cut' part of my skin for performing a biopsy." He claims that he "was referred to a dermatologist, but I was not taken to the specialist until I filed a complaint in the U.S. District Court, and not on time to prevent irreparable damage to my skin." According to Mr. Diaz, the conduct of the defendants amounted to deliberate indifference to his serious medical needs.
 
 
 33
 Factual Background Of First Supplemental Complaint
 
 
 34
 In his first supplemental complaint, Mr. Diaz claims that he suffered from stomach pains beginning on Thursday, July 20, 1989. He alleges that during the next six days, up to and including the day he prepared his supplemental complaint, nurses Dawn Kortman and Caroline Schumaker refused to give him proper medical attention and deliberately ignored his serious medical needs. He further complains that he filed a request for medical attention with defendants G. Michael Broglin and Anthony Metzcus which was ignored.
 
 
 35
 Specifically, Mr. Diaz alleges that after he complained of stomach pains (which he claims resulted from an ulcer) on Thursday, July 20, 1989, he was examined and treated by unnamed nurses and told to make an appointment with the doctor for the following Monday morning. On Monday morning, July 24, 1989, Mr. Diaz says that upon his arrival at sick-call he was informed by Correctional Officer Brown that nurses Kortman and Schumaker would not see him "under any circumstance." After he complained and the nurses again refused to see him, Mr. Diaz claims that he was sent back to his dorm without medical attention. Mr. Diaz alleges that on three occasions during the rest of the day, various correctional officers attempted to obtain medical attention for him, but nurses Kortman and Schumaker thwarted each of these efforts. Mr. Diaz seeks $2,000 in compensatory damages and $5,000 in punitive damages from defendants Kortman and Schumaker.
 
 
 36
 The defendants contend that when Mr. Diaz entered WCC, he was immediately prescribed Maalox and Tagamet for his stomach problems. This contention is borne out by photocopies of WCC medical records which indicate that prescriptions for these medications were issued and continued throughout January and February, 1987. The records also indicate that from December 3, 1987 until July 22, 1989, Mr. Diaz never complained of a stomach problem.
 
 
 37
 WCC medical treatment records show that on July 22, 1989, Mr. Diaz complained of lower abdominal pain, heartburn, and diarrhea. He was treated in the dispensary by nurse Gail Westmoreland, who after consulting on the phone with Dr. Woodward, prescribed Maalox for Mr. Diaz's stomach and placed him on a restricted diet for the ensuing weekend. According to treatment documentation, Mr. Diaz failed to show up for sick-call on Monday, July 24. On August 4, 1989, he appeared at sick-call and continued to complain of lower abdominal pain and indigestion, but stated that the Maalox provided him with temporary relief. The treating physician subsequently renewed Mr. Diaz's prescription for Maalox. During the next eight months, WCC medical staff treated him 22 times, and he did not complain further about his stomach ailment.
 
 
 38
 Photocopies of offender grievance reports indicate that Mr. Diaz filed a grievance regarding the alleged denial of treatment for his stomach problems on July 24, 1989. On August 25, 1989, the Grievance Review Committee, composed of two inmates and two WCC staff members, found against Mr. Diaz and admonished him to "report to sick calls when passes are sent and prevent further 'no shows.' " (Exhibits B-1 and B-2, accompanying June 20, 1990 affidavit of Andrew Pazera.) Andrew Pazera, Correctional Casework Manager at WCC, has submitted a June 20, 1990 affidavit, confirming the investigation and dispensation of Mr. Diaz's grievance by the grievance committee.
 
 
 39
 Defendants Caroline Schumaker and Dawn Kortman each submitted sworn affidavits on June 19, 1990, stating that medical staff treated Mr. Diaz for his stomach problem on July 22, 1989, that neither of them refused at any time to see Mr. Diaz, that he was a "no show" for sick-call on July 24, and that he was seen again on August 4, 1989 for continuation of his treatment.
 
 
 40
 In his July 10, 1990 affidavit, filed in response to the defendants' June 27 motion for summary judgment, Mr. Diaz states that on July 24, 1989, he was escorted by Officer "Braham" to sick-call:
 
 
 41
 Upon arrival to the dispensary I was informed that the nurses Kortman and Schumaker refused to see me ... I overheard one of the nurses say 'I am tired of this shit.' I was returned to the djorm [sic] by Officer Braham. On my way up I talked to Mr. Pazera, from the dorm, Officer Seller together with Officer K. Norman attempted to get me into see the doctor, but the nurses refused to see me. I was in pain so I sent a request to Mr. Broglin and Mr. Metzcus, but they ignored my request for medical care. Then I filed a grievance and still they refused to provide me with medical care, for abdominal pain and other complications.
 
 
 42
 Mr. Diaz further states that "[t]he Maalox given to me by Gail Westmoreland on 7/22/89, was used in 2 days and on July 24, 1989, I did not have medication at all. I did not receive any medication until 8/24/89."
 
 
 43
 In support of his claim that defendant nurses Kortman and Schumaker refused to treat him on July 24, 1989, Mr. Diaz provides affidavits from Willie Phillips and Oliver Lawsen, two fellow offenders at WCC. In an affidavit dated October 25, 1989, Mr. Phillips states that on July 24, 1989, he had signed up on the sick-call list to see the doctor. Then, "[u]pon arrive [sic] at the dispensary, I was informed by officer BROWN that the nurse SHOEMAKER refused to see me." While Mr. Phillips was in the dispensary, he further states that "inmate FABIO DIAZ (who was in the same sick call list that I was) was denied medical attention (the nurse refused to see him) according with information by C/O Brown who informed that the nurse Shoemarker and koerman refused to see Diaz."
 
 
 44
 In an affidavit dated November 23, 1989, Oliver Lawsen states that on July 24, 1989, while he was in the dispensary for treatment of dandruff, "inmate FABIO DIAZ (who was in the same sick call list that I was) was informed by C/O BROWN that the nurse SHOEMARKER refused to see Mr. Diaz for his abdominal pain."
 
 
 45
 Factual Background of Second Supplemental Complaint
 
 
 46
 Mr. Diaz submitted his second supplemental complaint on September 13, 1990, and this court deemed it filed as of October 30, 1990. Mr. Diaz alleges that on September 9, 1990, he reported to sick-call complaining of a weight and high cholesterol problem which he claimed was contributing to a hereditary heart condition. According to Mr. Diaz,
 
 
 47
 DR. VELAZCO ordered low-colesterol [sic] diet to start immediately and for indifenite [sic] period of time, starting 9/9/90. When I showed up for my diet in the diet line, I was informed that I could not get my diet food, that I must take a tray like anybody else. So I did it. I complained with the Nursin [sic] room, and they stated that they did not have my record. I complained with the assistant whom give me the medications, and he stated that I sould [sic] check with the kitchen. I checked with the kitchen peple [sic] and they denied to know anything about my diet. I keept [sic] asking for my diet-food and I am being DENIED the diet prescribed by doctor VELAZCO. I have sent grievance to the complex director and to the superintendant [sic] at WCC, but I have not received any reply as of this date.
 
 
 48
 Mr. Diaz requests that the court grant him a declaratory judgment, and any other relief it deems just and proper, "[s]pecifically if I can get proper medical care."
 
 
 49
 In their answer to Mr. Diaz's second supplemental complaint, filed December 4, 1990, the defendants assert that Mr. Diaz has received medical attention for the heart ailment complained of, "including orders for a modified diet." The defendants claim that in his latest supplemental complaint, Mr. Diaz has failed to state a claim upon which relief may be granted.
 
 
 50
 In his reply to the defendants' answer, Mr. Diaz states that he "is in the process to prepare an amended complaint to include two or three defendants liable for the constitutional violation in the supplemental complaint filed Oct. 30, 1990." The court notes that no such amended complaint has been submitted.
 
 
 51
 Further, Mr. Diaz claims that defendants Anthony Metzcus and G. Michael Broglin were responsible for imposing and enforcing the "policy that a diet prescribed by a doctor at WCC must be denied to the prisoner, until further communication with the A-building at Westville Corr. Center." He argues that "[t]he policy and custom (as described above) imposed by Mr. G.M. BROGLIN, and enforced under the supervision of ANTHONY METZCUS, violates my constitutional rights to be free from cruel and unusual punishement [sic], since I was denied a prescrived [sic] diet, and exposed to heart failure and the possible resulting death.
 
 Mr. Diaz's Eighth Amendment Claim
 
 52
 Despite the substantial documentary evidence of numerous medical examinations and careful treatment of his various ailments, Mr. Diaz asserts that the defendants have acted with deliberate indifference to his medical needs. Because he is proceeding pro se, this court recognizes the need for liberally construing his complaint, pursuant to Haines v. Kerner, 404 U.S. 519 (1972).
 
 
 53
 With respect to medical care, Mr. Diaz can establish an Eighth Amendment violation only if there is proof of "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). "Deliberate indifference" can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. See also Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir.1980) (citation omitted), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) (deliberate indifference may be manifested by "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" or it can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.").
 
 
 54
 In Estelle, however, the court cautioned that "[t]his ... does not mean ... that every claim by a prisoner that he has not received adequate medical treatment states a claim under the Eighth Amendment." Id. at 105, 97 S.Ct. at 291. Medical malpractice, inadvertent failure to provide adequate medical care, or simple negligence does not amount to a constitutional violation. Id. at 106, 97 S.Ct. at 292. As the Seventh Circuit stated in Duckworth v. Franzen, 780 F.2d 645, 652-53 (7th Cir.1985), "the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is insufficient. Id. at 653. See Smith-Bey v. Hospital Administrator, 841 F.2d 751, 759 (7th Cir.1988); Shockley, 823 F.2d at 1072; Ford v. Lane, 714 F.Supp. 310, 315-16 (N.D.Ill.1989).
 
 
 55
 A prisoner can prove criminal recklessness only by demonstrating a defendant's subjective mental state; liability cannot be predicated on an objective consideration of what a defendant "should have known." McGill v. Duckworth, Nos. 90-1845 and 90-1945, slip op. (7th Cir. Sept. 17, 1991); see Steading v. Thompson, 941 F.2d 498, 499. The requisite subjective intent may be established by: 1) showing that a defendant had " 'actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it,' " McGill, slip op. at 6, quoting Franzen, 780 F.2d at 653; or 2) showing that a defendant deliberately avoided acquiring knowledge of the impending harm. McGill, slip op. at 12.
 
 
 56
 Although negligence alone, or simple medical malpractice, is insufficient to state a claim for relief, Estelle, 429 U.S. at 106, 97 S.Ct. at 292, courts have begun to recognize that repeated, long-term negligent treatment of a prisoner's medical condition, rather than intentional actions, may amount to deliberate indifference to serious medical needs under certain circumstances. See Kelley v. McGinnis, 899 F.2d 612, 616 (7th Cir.1990). Thus, in Wellman v. Faulkner, 715 F.2d 269, 272 (7th Cir.1983), cert. denied, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984), the Seventh Circuit held that " 'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff' can sufficiently evidence deliberate indifference." ( Quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981)). The "pattern of conduct" which was found to establish "deliberate indifference" in Wellman included a prison medical staff composed of non-English speaking doctors, a failure to provide adequate psychiatric care and a failure to keep sufficient medical supplies on hand. 715 F.2d at 272-74.
 
 
 57
 In Benson v. Cady, 761 F.2d 335 (7th Cir.1985), the Seventh Circuit reviewed a prisoner's complaint which alleged that he was negligently injured by the defendants, failed to receive proper treatment after waiting two days to see a doctor, given a psychiatric drug instead of a pain killer, and subjected to injury-aggravating conditions. The court noted that the plaintiff had alleged no specific deficiencies in the health care system from which deliberate indifference could be inferred, no refusal by the defendants to provide prescribed treatment, and no deliberate interference with prescribed treatment. Noting that the plaintiff had stated only a claim for "mere negligence," the court found no actionable claim under the Eighth Amendment. The Benson court concluded that the plaintiff had, at best, stated a claim for medical malpractice, and pointed out that "[n]egligence in treating a medical condition was not actionable under the Eighth Amendment." 761 F.2d at 341.
 
 
 58
 More recently, in Kelley v. McGinnis, 899 F.2d 612 (7th Cir.1990), the plaintiff alleged inadequate medical treatment for his chronic foot problem over a three-year period. In reversing an entry of summary judgment in favor of the defendants, the Seventh Circuit found that the complaint alleged facts sufficient to prevail under the Eighth Amendment if the plaintiff could substantiate his claims. Kelley, 899 F.2d at 615. The court observed that the complaint had alleged facts which, if proven, were sufficient to prevail on an Eighth Amendment claim. Id. at 616. In this regard, the court stated:
 
 
 59
 Whether Kelley [plaintiff] can prevail on his Eighth Amendment claim under the facts he has alleged will depend on his ability to adduce evidence either to counter a properly filed and noticed motion for summary judgment or to prove his case should it proceed to trial.
 
 
 60
 899 F.2d at 617.
 
 
 61
 In the present case, the court is presented with a pro se plaintiff who has proceeded well past the pleading stage into discovery, and his case is before the court on a motion for summary judgment. The defendants have met their initial burden of informing the court of the basis for their motion and have "identified" those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... which ... demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323, 106 S.Ct. at 2553. Defendants have demonstrated that Mr. Diaz was repeatedly seen by both WCC medical staff and an outside specialist in regard to his medical complaints. In response, Mr. Diaz has been unable to present evidence which would sufficiently counter the defendants' assertions and thus demonstrate the existence of a genuine issue of material fact requiring trial.
 
 
 62
 Even construing Mr. Diaz's complaint and his response to defendants' summary judgment liberally, the court finds nothing in the record from which it could be inferred that serious deficiencies in WCC's health care system exist from which deliberate indifference can be inferred. There are no allegations nor any evidence that the deficiencies which the court found to be evidence of deliberate indifference in Wellman, existed in this case. Nor is there any evidence that defendants refused to provide the prescribed treatment, or in any other way deliberately interfered with Mr. Diaz's prescribed treatment.
 
 
 63
 Indeed, the evidence in the record indicates that defendants went to extraordinary lengths to treat Mr. Diaz's ailments. Mr. Diaz was repeatedly seen by and referred to doctors and specialists. Various medications for his skin rash and his stomach condition were prescribed and distributed to Mr. Diaz on numerous occasions. Moreover, it was Mr. Diaz, himself, who failed to appear for a scheduled sick-call appointment on July 24, 1989, for treatment of his stomach condition.
 
 
 64
 Mr. Diaz's allegations that he was deliberately denied treatment for his skin and stomach problems, that he was denied access to a dermatologist, that he was deliberately denied prescribed medication by Kurt Plescher, that nurses Dawn Kortman and Nancy Schumaker refused to admit him to his sick-call appointment, and that Anthony Metzcus and G. Michael Broglin implemented a policy which prevented him from utilizing the special low cholesterol diet prescribed for him are not substantiated in the record. The record contains nothing to suggest that any of the numerous medical personnel who at one time or another have treated Mr. Diaz's myriad afflictions consciously declined to order or prescribe specific treatments or measures in an attempt to harm him or cause him pain.
 
 
 65
 On the contrary, the record indicates that the response of WCC medical personnel to Mr. Diaz's ailments was fully consonant with their responsibilities as health professionals. In the final analysis, Mr. Diaz's pleadings and various affidavits represent unfounded, conclusory allegations which are not substantiated by the evidence. Mr. Diaz has submitted no evidence sufficiently refuting the defendants' evidence, nor any evidence supporting his numerous claims. Since Mr. Diaz bears the burden of proof on these particular issues, he cannot resist defendants' summary judgment motions merely by resting on his pleadings and the unsubstantiated and inconclusive affidavits of himself and other inmates.
 
 Recommendation
 
 66
 For the foregoing reasons, the court finds that there is no genuine issue of material fact and that the defendants are entitled to judgment in their favor as a matter of law. Accordingly, the court recommends as follows:
 
 
 67
 1. That the defendants' motion for summary judgment with respect to the plaintiff's Eighth Amendment claims against all the defendants be GRANTED.[1]
 
 
 68
 2. That the plaintiff's motion for summary judgment with respect to his Eighth Amendment claims against the defendants be DENIED.
 
 
 69
 ANY OBJECTIONS to this report and recommendation must be filed with the Clerk of courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Lockert v. Faulkner, 843 F.2d 1015 (7th Cir.1988); Video Views, Inc. v. Studio 21 Ltd., 797 F.2d 538 (7th Cir.1986).
 
 
 70
 Dated this 31st day of October, 1991.
 
 
 71
 /s/ Robin D. Pierce
 
 Robin D. Pierce, U.S. Magistrate Judge
 
 72
 cc: Chief Judge Allen Sharp
 
 Magistrate Pierce
 Fabio Diaz
 M. Schoening
 Order Book
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Cir.R. 34(f). No such statement having been filed, the appeal has been submitted on the briefs
 
 
 [1]
 This court notes that Judge Sharp previously reserved ruling on a motion by defendants' Schumaker and Kortman to set aside the Clerk's entry of default. (See Order of April 26, 1990.)