Steve **RUTLEDGE**, Plaintiff,

v.

Jerome **SPRINGBORN**,
et al., Defendants.

No. 91 C 760.

United States District Court,
N.D. Illinois, E.D.

Oct. 20, 1993.

John B. Haarlow, Joseph A. Hinkhouse, Chicago, IL, for plaintiff.

Thomas L. Ciecko, Andrew N. Levine, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Joliet Correctional Center ("Joliet") prisoner Steve Rutledge ("Rutledge") has brought this 42 U.S.C. § 1983 ("Section 1983") action against four former and present employees of the Illinois Department of Corrections ("Department") at the Joliet facility: former Warden J.W. Fairman ("Fairman"),

Assistant Warden Jerome Springborn ("Springborn"), Transfer Coordinator Diane Jockisch ("Jockisch") and Internal Security Investigator Russell Nelson ("Nelson").[1] Rutledge, who had alerted authorities to a planned prison escape, alleges that he was later burned on two occasions when other prisoners threw scorching liquids on him. According to Rutledge, defendants violated the Eighth Amendment's proscription against cruel and unusual punishment by failing to protect him.[2]

All defendants now move for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons set forth in this memorandum opinion and order, Jockisch's and Nelson's motions are granted and Fairman's and Springborn's motions are denied.

*Summary Judgment and General Rule 12*

Familiar Rule 56 principles impose on movants the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)), but that requirement does not destroy Rule 56's "utility as a vehicle for the final disposition of lawsuits without the need for an evidentiary hearing" (*Wilcox v. Niagara of Wis. Paper Corp.*, 965 F.2d 355, 356 (7th Cir. 1992)). For Rule 56 purposes a "genuine" issue does not exist unless record evidence would permit a reasonable factfinder to adopt the nonmovant's view (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)), and only facts that would prove outcome-determinative under the substantive law are "material" (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)).

In both the latter respects this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991)). While that standard is applied with added rigor where intent is in issue, that does not negate the potential for summary judgment in such cases (*Washington v. Lake County*, 969 F.2d 250, 254 (7th Cir. 1992)). Moreover, "a plaintiff facing the prospect of summary adjudication cannot 'sit back and simply poke holes in the moving party's summary judgment motion'" (*Young In Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993)).

This Court's General Rule ("GR") 12 helps the district court to cull the wheat from the chaff in applying those principles (see *Stewart v. McGinnis*, 5 F.3d 1031 at 1033–35 (7th Cir.1993))—that is, "to smoke out quickly whether there are really disputed factual issues and, if so, whether they are really material (that is, 'outcome determinative')" (*Moore v. NutraSweet Co.*, 836 F.Supp. 1387 at 1390 n. 5 (N.D.Ill.1993)).[3] Here only de-

---

1. On February 5, 1991 Rutledge filed his pro se Complaint and application to proceed in forma pauperis. It was assigned to the calendar of this Court, which promptly determined that his submissions met the requirements for such filing (both in financial terms and because the Complaint was non-"frivolous" under the standards prescribed by *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)) and drew on this District Court's trial bar to appoint pro bono counsel. Rutledge later moved for issuance of a mandatory preliminary injunction to compel his transfer from the protective custody unit at Joliet. After an evidentiary hearing, including testimony from Department's Assistant Deputy Director for the Northern Region Michael O'Leary ("O'Leary") who said that residence in protective custody at Joliet may be more conducive to a prisoner's safety than his residing in the general population at a medium security institution where no protective custody exists, this Court denied that motion on May 7, 1992.

2. As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

3. GR 12(M) requires each Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each fact alleged. Then GR 12(N) requires each nonmoving party to respond point by point, with citations to the record in support of (1) any claimed dispute as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert.

fendants have submitted a GR 12 filing.[4] Whatever the reason for the lapse by Rutledge's able appointed counsel in not responding with a GR 12(N) statement (though it has hampered the analysis of the case), such failure does not necessarily seal Rutledge's fate: Rule 56(e) teaches that a district court may deem admitted only properly supported statements from the movant's GR 12(M) statement (*Stewart*, 5 F.3d at 1033–35). *Wienco, Inc. v. Katahn Assoc., Inc.*, 965 F.2d 565, 568 (7th Cir.1992) explains:

> Strict enforcement of Rule 12(n) does not mean that a party's failure to submit a timely filing automatically results in summary judgment for the opposing party.... To warrant summary judgment, the district court must make the further finding that given the undisputed facts, summary judgment is proper as a matter of law. As a result, though it certainly does not help the nonmovant, failure to file a timely 12(n) is not necessarily fatal.

As it turns out, the absence of Rutledge's responsive GR 12(N) statement does not affect him: Many facts that are either in dispute or that would properly call for inclusion in the GR 12(M) response either were before this Court on the preliminary injunction motion or are made clear from Rutledge's memorandum (which *is* supported by record citations) and from his deposition.[5]

### Rutledge's Story

This section will set out the background of Rutledge's grievance with defendants in substantial detail.[6] Some additional facts are provided as necessary later in the text.

Rutledge, a 27–year–old who is serving a 70–year sentence for murder, has been confined at Joliet since June 1988 (Rutledge Dep. 5, 10, 19–20; D. 12(m) ¶ 3).[7] He is a jailhouse lawyer who has been diligent in protecting prisoners' rights, acting on behalf of himself and others (see, e.g., Rutledge Dep. 10–16, 43), and he claims as a result to have incurred the wrath of Joliet officials (*id.* 103):

> They never liked me. I always stood on what I believed. If they didn't give me something, I wrote grievances of everything. I'd make sure everything was proper.

Around June 1990, while Rutledge was in protective custody (*id.* 32–33),[8] an inmate on whose appeal Rutledge was working approached him and tried to involve him in an escape attempt that involved members of the North Side Gang (*id.* 40–44). Fearful that the planned escape would end in tragedy, Rutledge wrote to the Governor (*id.* 55, 70–71).[9] Not receiving a response, Rutledge then passed a note to his counselor that asked for a meeting with the Warden (*id.* 71). About 1–½ hours later Rutledge was called into a meeting with Fairman, Springborn and a Lieutenant Breeding (*id.* 72–73). During the next two hours Rutledge explained his knowledge of the escape plan and identified the inmates who were involved (*id.* 72–74). In addition he expressed specific concern over the danger that would be created were his identity as an informant exposed (*id.* 74, 76–77), for example by his being let out of segregation before inmates who were in-

---

**4.** Although defendants have mistakenly labeled their statement "12(*l*)," reflecting the GR's subparagraph designation before it was amended several years ago, the statement will be cited as "GR 12(m)."

**5.** Key submissions by the parties will be referred to in this way:

1. memoranda in support of and in opposition to defendants' Rule 56 motions: "D.Mem.—," "P.Mem.—" and "D.R.Mem.—";
2. defendants' GR 12(M) statement: "D. 12(m) ¶ —";
3. deposition testimony: "[Name of deponent] Dep.—"; and
4. affidavits: "[Name of affiant] Aff. ¶ —."

**6.** Though Rutledge's deposition is unclear and confusing in places, it suffices to provide the general outline of his complaints now at issue.

**7.** Rutledge was sentenced on a guilty plea in January 1988 (Rutledge Dep. 10, 19).

**8.** Fairman Aff. ¶ 7 explains:

> Protective custody is a special unit at Joliet. Its purpose is to segregate inmates who claim to have been threatened from the general population in order to enhance their safety.

**9.** Rutledge initially wrote to the Governor rather than speaking to Joliet officials because he did not think confidentiality was sufficiently protected at the institutional level (*id.* 63–64).

volved in the escape (*id.* 83),[10] and he was assured that his confidentiality would be maintained (*id.* 75, 77–78).

After Rutledge had brought the escape plan to official attention, Nelson was brought in to investigate it (*id.* 79–80; Nelson Aff. ¶ 7). Nelson interviewed Rutledge as part of his investigation, and Rutledge again expressed concern over his safety (*id.* ¶ 8). Nelson also told Rutledge that his confidentiality and security would be secured. Specifically Nelson said that Rutledge would be put in segregation and that he "would receive fabricated tickets to show that you were guilty of this crime and everything" (Rutledge Dep. 81).[11] Rutledge voiced his fear that if he were to be transferred out of segregation to another area of Joliet before the transfer of persons on whom he had snitched, his identity as the informant would become known and he would be placed in danger (*id.* 83). Rutledge also suggested among other things that he would be safer at a medium security prison (*id.* 85).

Just a few days after his meeting with Nelson, Rutledge—who was in West Segregation along with those who had planned the escape—received a ticket for "[c]onspiring to commit an escape" (*id.* 90). Soon thereafter Rutledge was moved to North Segregation (*id.* 91). Being moved elsewhere in segregation did not bother Rutledge, however, because he could show his ticket to friends there and "play a role with it" (*id.*). While in North Segregation Rutledge requested another meeting with correctional personnel, and this time Fairman, Springborn, Nelson and another investigator met with him. Rutledge was concerned because he was receiving more tickets and he thought that his being questioned about them in front of his cell (through the use of a speaker) imperiled

his confidentiality (*id.* 88, 92–93). At that meeting Rutledge was again told that it would be made to look as though he were found guilty though he was not (*id.* 94). And regarding confidentiality "[t]hey promised I would not be let out of segregation until they were transferred out of segregation themselves so the word wouldn't get out" (*id.*).

On August 2, 1990 (a week or two after that meeting) Rutledge was returned to protective custody (*id.* 97; D. 12(m) ¶ 13). That day Rutledge was threatened by an inmate Pryor, who had been under investigation and had already been released from segregation (Rutledge Dep. 99–101). Pryor told Rutledge that he knew Rutledge had ratted (*id.* 99–100):

He said I know who told. It was you. And I didn't—and I'm going to let my North Side brothers know. Because he already got word that I was being let out.

And he got word over to segregation and they found out. And they—and then they sent word back over to have me killed.

Q. Did he say how he knew that you told?

A. Yes, he was Phillips's cell mate. And they talked a lot. And being that they were so close to each other, Phillips [the inmate who had originally approached Rutledge] said if Rutledge ever comes out of segregation, let me know quickly because he will be the person that told because only four people knew except Pryor.[12]

Rutledge received threats other than Pryor's as well, and North Side Gang members who were fellow inmates spit at him and threw hot water at him (*id.* 101, 105–06). So he wrote Springborn asking for help (P.Ex. 8), but he received no answer (Rutledge Dep.

---

10. It was anticipated that those being investigated in connection with the planned escape would be kept in the high security confinement known as segregation, where prisoners spend almost all of their time locked up, including being given their meals in their cells (*id.* 75, 188).

11. Rutledge was unsure whether Nelson used the term "fabricate" but was clear on the content of Nelson's statements (*id.* 82):

I don't know if he said fabrication. But he said he would make it look like I'm being

found guilty of the tickets. So I guess you call it—that's my own term, fabrication.

12. [Footnote by this Court] Apparently Pryor's knowledge of the escape plan did not implicate him as a snitch on his release from segregation (*id.* 100):

Pryor knew about it because he—but he was a cell mate and stuff. And they really believed each other and trusted in each other. So he didn't believe he did it.

106). Fearful, Rutledge made an effort at self-help (or more accurately self-preservation), principally by refusing to leave his cell even to eat [13] after he had been placed in protective custody and by pulling all-night lookouts with his cellmate (*id.* 106, 137, 147).[14]

Rutledge was unsuccessful in his efforts to protect himself. Between 5 and 6 a.m. on October 10, 1990 Rutledge and his cellmate had both fallen asleep when Rutledge heard a scream and felt his arm burning (*id.* 136–39). Hot liquid had been thrown on both cellmates, and they both received medical treatment for their burns (*id.* 143–44).

After being scalded Rutledge went on another food strike, and he was then placed on administrative hold in the hospital until at least December 1990 (*id.* 161–62, 172).[15] At that point Rutledge heard "from an officer that all North Side gangs was completely transferred out because of a gang riot," and he returned to protective custody (*id.* 132, 162–65). Rutledge soon resumed eating in the dining hall and going to the gym (*id.* 132, 162–63).

Thereafter, however, Rutledge's concerns about his security again increased (*id.* 165–72). Rutledge's then cellmate (not the same one who had been burned in October 1990, *id.* 164–65, 172) heard two North Side Gang members saying that they were "going to have me shanked because of what I did to their brothers and tricked on their brothers about the escape" (*id.* 166). Fearful of leaving his cell for food, Rutledge then went on another hunger strike, which lasted eight days until he spoke to Warden Cooper, who had replaced Fairman (*id.* 174).[16] Rutledge was then placed in North Segregation (*id.*).[17]

After he had been placed in North Segregation Rutledge started to receive tickets for refusing housing (*id.* 174, 178). Several months after Rutledge was placed in segregation a member of the Latin Kings, Louis Burerro ("Burerro"), was placed in Rutledge's cell (*id.* 184–86, 188).[18] Burerro convinced Rutledge that if Rutledge did not move out he would execute an assault on behalf of the North Side Gang (*id.*).[19] Rutledge then stopped refusing housing and agreed to go back to protective custody, in part because of Burerro's threats and in part because he was being given tickets and threatened with the loss of good time for having refused housing (*id.* 185, 187). That was around October 1991 (*id.* 188).

---

13. Rutledge apparently left his cell on two occasions before the first burning. Around September 12 he found two metal shanks—crude weapons made of metal that apparently had been planted in his cell in an effort to get him back into segregation, where the inmates who planned the escape still were confined—and he was then brought to an office (*id.* 106, 125). Later that month, after officials had stopped delivery of food to Rutledge's cell and he stopped eating, Rutledge was brought to the hospital (*id.* 107, 130).

14. At some point, though it is not clear from the submissions whether it was before or after the first burning, a guard also put a "U-bolt" lock on Rutledge's cell. Springborn, apparently in accordance with prison rules, had it removed (Springborn Dep. 55).

15. Rutledge's deposition is unclear on the date that he left the hospital and went back into protective custody (see, e.g., *id.* 171).

16. In April 1991 Fairman finished his service as Joliet's Warden (Fairman Aff. ¶2). On May 1, 1991 Springborn was transferred from his position as Assistant Warden of Operations, in which he was responsible for security, including "West cell housing which included North segregation and protective custody" (Springborn Aff. ¶6). Instead he was named Assistant Warden of Programs and served in that position until September 1, 1991 (*id.* ¶5). Fairman is now Executive Director of the Cook County Department of Corrections (Fairman Aff. ¶1), and Springborn is Assistant Warden of Programs at Stateville Correctional Center ("Stateville") (Springborn Aff. ¶1).

17. Apparently, Rutledge was also temporarily placed in West Segregation (*id.* 176, 180). But he did not stay there long because two inmates who had threatened him were there (*id.* 176, 183). Rutledge attributes that switch to West Segregation to ill motives on Warden Cooper's part (*id.* 176–78).

18. For most of his time in segregation (all but a month out of some 4-½ months there) Rutledge had been housed alone (Rutledge Dep. 184). Rutledge was told he was then given a cellmate because of a shortage of space (Rutledge Dep. 184–85).

19. Rutledge told his attorney—but not any authorities—about Burerro's threats (Rutledge Dep. 189).

Toward the end of October 1991 Rutledge noticed prisoners talking about him and "giving [him] some heavy looks" (*id.* 194; see also *id.* 191). Though Rutledge told "many officers," he did not notify any of the regular protective custody staff members that he felt threatened, because he thought the officer he told would write a report (*id.* 194–96). At about 12:30 p.m. one day that fall, hot liquid was again thrown on Rutledge, and he was again burned (*id.* 196, 198–99; D. 12(m) ¶25).[20]

### Eighth Amendment Standards

■ Rutledge does not (and he need not) allege that it was any of the defendants who attacked him directly (*Duane v. Lane*, 959 F.2d 673, 676 (7th Cir.1992)). To carry his burden on the current motion, Rutledge must at least raise a genuine issue as to whether defendants intentionally failed to protect him from other prisoners (*id.* at 675).[21] And as the ensuing explanation reflects, "deliberate indifference" is enough to create an inference of such intent.

■■ *McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir.1991) (citations omitted) explains the state's duty to protect prisoners from their fellow inmates:

> Although the Supreme Court has never held that the eighth amendment requires the state to protect prisoners from each

other, the duty to do so is a logical correlative of the state's obligation to replace the means of self-protection among its wards. A state with a constitutional duty to attend to prisoners' medical problems, even though the problems are not of the state's creation, has no lesser obligation to attend to the need for physical safety. *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), although decided under the due process clause of the fourteenth amendment, assumes that the prison system may not ignore prisoners' risk of harm at the hands of other inmates.

Because the Eighth Amendment does not impose absolute liability, Rutledge must raise a reasonable inference that the prison officials acted with intent (*id.*). It is not enough to show negligence or even recklessness[22] as that term is employed in tort cases. Instead "intent" exists for Eighth Amendment purposes where the prison official is at a minimum criminally reckless or deliberately indifferent—that is, has "actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it" (*Duane*, 959 F.2d at 676 and *McGill*, 944 F.2d at 348, both quoting *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir.1985)).[23] In that respect a "prisoner normally proves actual knowledge of impending harm by showing that he alerted prison

---

**20.** Rutledge's deposition is unclear on the date of the second burning (see, e.g., Rutledge Dep. 163–64, 190). D. 12(m) ¶25, which assigns November 10, 1991 as the date of the burning, points to Rutledge's Complaint for that purpose. Although the allegations in a complaint do qualify as admissions and hence as evidence for Rule 56(c) purposes, they do not constitute judicial admissions so as to be noncontrovertible by Rutledge's sworn testimony (*Carrier Corp. v. Block Steel Corp.*, 1993 WL 243179 at *9 n. 6 (N.D.Ill. June 30); see generally *Contractor Utility Sales Co. v. Certain–Teed Products Corp.*, 638 F.2d 1061, 1084–85 & n. 30 (7th Cir.1981)). Although that doctrine is normally stated in terms of earlier superseded pleadings, the ability to amend pleadings to conform them to the proof makes that a nonmeaningful distinction. In any case, the date makes no difference except perhaps for credibility purposes (to be resolved by the jury anyway).

**21.** Rutledge need not show extensive injuries from the hot water attack (*Hudson v. McMillian*,

—— U.S. ——, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).

**22.** For tort law purposes recklessness is defined as "disregarding a substantial risk of danger that either is known or 'would be apparent to a reasonable person' in the defendant's position" (*McGill*, 944 F.2d at 348). By contrast, the criminal law definition contains a subjective component. As a result, "liability cannot be predicated on an objective consideration of what a defendant 'should have known'" (*Williams v. O'Leary*, 805 F.Supp. 634, 637 (N.D.Ill.1992)).

**23.** Defining intent for Eighth Amendment purposes has not been without its problems (see, e.g., *McGill*, 944 F.2d at 347–49; *Wilson v. Seiter*, —— U.S. ——, ——–——, 111 S.Ct. 2321, 2323–2327, 115 L.Ed.2d 271 (1991)). As *McGill*, 944 F.2d at 351 about the deliberate indifference standard:

> This seeming oxymoron has given us, in company with other courts of appeals, fits.

officials to an identifiable threat to his safety" or by showing "the existence of so substantial a risk of harm that 'the defendants' knowledge of risk can be inferred' " (*James v. Milwaukee County*, 956 F.2d 696, 700 (7th Cir.1992)). Under Section 1983 Rutledge also faces the additional burden of raising a material factual issue as to defendants' personal involvement (see, e.g., *Moore v. Indiana*, 999 F.2d 1125, 1129 (7th Cir.1993).[24]

With those principles set out, this opinion turns to the bases on which each defendant now seeks judgment as a matter of law. Because the same principles control as to Fairman and Springborn, they will be discussed together, while the other two defendants require separate treatment.

### 1. *Fairman and Springborn*

■ Rutledge maintains that Fairman and Springborn disliked him because he frequently complained and because they thought he was involved in the escape (Rutledge Dep. 103; Fairman Dep. 87–88; Springborn Dep. 25–26). Rutledge argues that to get even with him Fairman and Springborn revealed his identity as an informant (P.Mem. 10):

> [T]hese two individuals placed plaintiff back in the protective custody unit while the gang members guilty of the escape were kept in segregation—telling the entire unit that it must have been Rutledge who was the informant.

Surprisingly, Fairman's and Springborn's memoranda do little to contest Rutledge's claim in material respects—in fact they do not directly controvert Rutledge's accusation that they intentionally revealed his identity.

Rather, D.Mem. 21 argues in response that "[t]here exists no evidence which indicates that J.W. Fairman or Springborn intended any harm to come to the plaintiff" and that "[i]n fact, the evidence demonstrates that Fairman and Springborn took actions to prevent harm." Specifically Fairman and Springborn point out that they (1) placed Rutledge in protective custody, which is designed physically to "separate inmates in order to enhance their safety," and (2) approved transfers for Rutledge (*id.*).[25]

There is a real inconsistency between the Fairman–Springborn contention that they intended no harm to Rutledge and their failure to contest his allegation that they intentionally revealed his identity as an informant when they removed him from segregation and placed him in protective custody. They invoke *McGill* to argue that Rutledge, like McGill, would have been in danger anywhere and that they, like the defendants in *McGill*, did all they could to protect him—D.Mem. 22 says:

> Since Rutledge's transfer requests were denied, Fairman and Springborn could do no more to protect Rutledge than to place him in the safest living unit at Joliet, protective custody.

But that ignores Rutledge's assertion that they placed him in protective custody specifically *because* of the increased danger that assignment carried with it.

*McGill* is really wholly off point, for in that case "[n]othing in this record implies that the [prison officials] put McGill in [his housing assignment] *because of*, rather than *in spite of*, the risk to him" (944 F.2d at 350). By contrast, that is precisely what Rutledge

---

24. *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir.1986) draws together earlier precedents into a brief summary:

> In *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983), this court stressed that "[s]ection 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." (emphasis in original); *see also McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir.1982); *Adams v. Pate*, 445 F.2d 105, 107 (7th Cir.1971). · "Without a showing of direct responsibility for the improper action, liability will not lie against a supervi-

sory official. A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Wolf–Lillie*, 699 F.2d at 869. In short, "[i]ndividual liability for damages under section 1983 is predicated upon personal responsibility." *Schultz v. Baumgart*, 738 F.2d 231, 238 (7th Cir.1984).

25. Fairman approved transfers for Rutledge on August 6, 1990 and on November 13, 1990 (D. 12(m) ¶¶ 46–47). Springborn approved a transfer for Rutledge in November 1990 (*id.* ¶ 56). Each transfer was ultimately denied by Jockisch (*id.* ¶¶ 46–47, 56).

maintains and supports with record evidence. If the two supervisory defendants indeed put Rutledge into protective custody with the intention of revealing his identity as an informant, that could well give rise to an Eighth Amendment violation (cf. *C.H. v. Sullivan,* 718 F.Supp. 726, 735 (D.Minn.1989) ("The discovery of a prisoner's identity . . . may constitute cruel and unusual punishment"), *aff'd,* 920 F.2d 483, 486 (8th Cir.1990)). As *McGill,* 944 F.2d at 347 put it:

> If prison officials put [plaintiff] into the [confinement assignment] so that a bigger inmate would have a better chance to rape him, then it is as if the officials inflicted that pain and humiliation themselves.

Liability can likewise arise if those defendant were deliberately indifferent in that placement (see *Santiago v. Lane,* 894 F.2d 218, 222–23 (7th Cir.1990)).

Nor can either of those two defendants eliminate a genuine issue of material fact merely by having approved a transfer. In Springborn's case, he did not review and approve a transfer until November 1990, after Rutledge had been burned the first time (Springborn Aff. ¶ 9)—and it will be remembered that Rutledge had expressly alerted Springborn to his concerns about endangerment before that first attack. As for Fairman, it is true that he approved Rutledge's transfer on two occasions, once before and once after the initial attack in October 1990. But those factors that would tend to negate any inference of deliberate indifference do not *as a matter of law* eliminate the factual issues as to both Fairman and Springborn (1) whether Rutledge was clearly unqualified for transfers (which were denied on each occasion by the transfer coordinator), in which case the Springborn and Fairman approvals may have been no more than deliberately indifferent lip service, (2) whether those transfer approvals were really efforts to protect Rutledge[26] and (3) whether their failure to do something different or something more indicates deliberate indifference toward Rutledge (see *Santiago,* 894 F.2d at 222–23). It may well be that a jury will accept Fairman's and Springborn's versions and reject Rutledge's—but the point is that the decision must be made by a trier of fact and not of law.

In short, there is a genuine issue as to whether Fairman and Springborn were deliberately indifferent in failing to protect Rutledge.[27] That issue, along with his possible damages, remains to be fleshed out at trial.[28]

### 2. *Jockisch*

 Rutledge maintains that Jockisch was deliberately indifferent to his safety con-

26. D.Mem. 17 suggests that Fairman's response to Rutledge's August 1990 request for transfer was to ask that he be transferred to Stateville. At his deposition Rutledge said that Stateville would not have been safe for him because word of this informant activities would already have spread through the prison system (Rutledge Dep. 115–16).

27. D. 12(m) ¶ 15 attempts to make hay of Rutledge's failure to report oral threats, which he received between August and October 1990, to correctional officers in protective custody. But it is clear that Rutledge did voice his concerns to others through his letter-writing campaign and his refusal to come out of his cell. Similarly, D. 12(m) ¶ 27 emphasizes that Rutledge did not notify protective custody staff members that other prisoners were giving him weird looks before the second burning incident. That too provides an incomplete picture, for Rutledge did complain to officers in the yard and he thought that such complaints sufficed to bring the matter to the attention of the correctional staff (Rutledge Dep. 194–96). Significantly in connection with the first burning, in addition to his advance warnings that defendants would place him in danger

by releasing him from segregation before those involved in the escape, Rutledge wrote Springborn the day after he was placed back in protective custody, reporting that Pryor had specifically stated that the word was out that Rutledge had snitched (P.Ex. 8). And Rutledge refused to come out of his cell because of the danger that he perceived. In any event, failure to complain about a specific threat is not necessarily material in this case. As *Swofford v. Mandrell,* 969 F.2d 547, 551 (7th Cir.1992) explains, quoting *McGill,* 944 F.2d at 349:

> "A prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." But when prison officials themselves actively and knowingly (or recklessly) place a detainee in a particular situation that is dangerous, then such a report becomes superfluous.

28. Fairman and Springborn have not made any separate arguments as to their liability for the second burning. At that point Fairman was no longer at Joliet, and Springborn's duties had changed. That issue too remains to be dealt with at trial.

cerns. P.Mem. 12 says that Rutledge wrote her both before his first burning and "on numerous other occasions describing the danger and requesting a transfer to a safer facility" and that she had the power to transfer him to a medium security facility.[29] In response Jockisch contends that she acted properly and that there is no evidence that she acted with deliberate indifference. *Shango v. Jurich*, 681 F.2d 1091, 1102 (7th Cir.1982) (citations omitted) cautions against judicial interference with such transfer decisions:[30]

> [I]nterprison transfers obviously are not "mindless events;" rather, "[t]ransfers between institutions ... are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate." Such a predictive "decision turns of a 'discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done.'" Such discretionary decisions are the business of penologists and "are not the business of federal judges."

Because the evidence suggests no more than that Jockisch acted within her best judgment, she prevails as a matter of law.

As transfer coordinator Jockisch is responsible for placement of inmates (Jockisch Aff. ¶¶ 1–2). According to her Aff. ¶ 6, she received a request in August 1990 to transfer Rutledge to Stateville but "denied that request because Steven Rutledge's enemies, the inmates involved in the escape plan, were being transferred from Joliet Correctional Center."

In October 1990 Jockisch received another request to transfer Rutledge, this time to the medium security Shawnee Correctional Center (*id.* ¶ 7). Before she denied that request,

Jockisch traveled to Joliet and met with Rutledge (*id.* ¶ 11) and also discussed Rutledge's transfer request with Assistant Deputy Director O'Leary and Deputy Director Leo Meyer. All three agreed that Rutledge should not be sent to a medium security facility (*id.* ¶ 12). Jockisch denied Rutledge's request to go to a medium security facility for two reasons (*id.* ¶¶ 8–9):

1. Transfer rules provide that an inmate should be within 12 years of his mandatory supervised release date to be eligible for placement in a medium security facility, and Rutledge had more than 30 years remaining before his release date.

2. Additional time was needed to monitor Rutledge's progress at Joliet.

Jockisch Aff. ¶ 10 also explains why she thought Joliet was the most appropriate placement for Rutledge:

a) Joliet is regarded as the protective custody facility for maximum security institutions.[31]

b) The 4 inmates Rutledge implicated in the escape plan had all been moved from Joliet to other maximum security facilities.

c) Medium security facilities do not have protective custody. Consequently, Rutledge, if moved to a medium facility, would be in a general population setting where inmates had freer, less supervised movement than in protective custody. Since North Side gang members are present in all facilities, Rutledge could be subject to greater harm in a medium facility which had freer movement than in protective custody at Joliet.

What Jockisch's testimony reflects, as did O'Leary's testimony on the preliminary injunction motion, is a permissible penological decision. As stated, her actions show only careful consideration, and there is no evidence to the contrary that could reasonably lead to an inference questioning her credibili-

---

**29.** Rutledge has provided this Court with copies of letters that he sent Jockisch (P. Exs. 9–11).

**30.** It is of course also firmly established that prisoners have no constitutional liberty interest in remaining in a particular institution or a particular prison placement (*Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and its numerous progeny).

**31.** [Footnote by this Court] *King v. Fairman*, 997 F.2d 259, 262 n. 3 (7th Cir.1993) states:

> It is undisputed that Joliet confines typically younger, smaller prisoners and that it is considered the protective custody prison among the four maximum security prisons in Illinois.

ty. That Jockisch had *discretion* to transfer Rutledge (as he stresses) does not call for any different conclusion. Because there is simply no evidence that Jockisch was deliberately indifferent to Rutledge's safety, she is entitled to judgment as a matter of law.[32]

### 3. *Nelson*

 Rutledge also seeks to impose liability on Nelson. That argument deservedly gets only short shrift.

Nelson's uncontested affidavit explains that in his role as an outside investigator he is not assigned to a particular prison or prisons but instead is called on to investigate specific internal security issues when an outsider is needed (Nelson Aff. ¶¶ 2–4). His duties do not include transfer or housing decisions (*id.* ¶¶ 5–6). In this instance his duty was to investigate the escape plan. That involved interviewing prisoners, including Rutledge (who expressed his safety concerns) (*id.* ¶ 8). Nelson prepared a July 23, 1990 report, after which he had no involvement with Rutledge (*id.* ¶¶ 9–10).

Although Rutledge has proffered his own conclusory assertions that Nelson was in cahoots with Fairman and Springborn, he has not directed this Court to any evidence suggesting either (1) that Nelson was deliberately indifferent to Rutledge's safety in any way or (2) that Nelson had any responsibility for or involvement in any action that was detrimental to Rutledge. Nelson too is therefore entitled to judgment as a matter of law.

### Conclusion

There is a genuine issue of material fact as to whether each of Fairman and Springborn was deliberately indifferent to Rutledge's safety. Their motions for summary judgment are therefore denied.

But there is no genuine issue of material fact in any respect as to Rutledge's claims against Jockisch and Nelson. Each is therefore entitled to judgment as a matter of law, and this action is dismissed as to them. As permitted under Rule 54(b) this Court expressly determines that there is no just rea-

son for delay and expressly directs the entry of final judgment against Rutledge and in their favor (see *National Metalcrafters v. McNeil,* 784 F.2d 817, 821 (7th Cir.1986)).

This action is set for a next status hearing at 9 a.m. October 29, 1993. At that time counsel should be prepared to discuss any necessary additional pretrial procedures and the setting of a trial date for Rutledge's action against Fairman and Springborn.

---

**32.** *Shea v. Fairman,* 1991 WL 101635 at \*2–3 (N.D.Ill. May 21) reached the same conclusion in resolving a similar prisoner claim against Jockisch.